## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHRISTINA CARMAN-NURSE,
    *Plaintiff*,

    v.

METROPOLITAN DISTRICT
COMMISSION,
    *Defendant*.

No. 3:16-cv-1987 (VAB)

## RULING ON MOTION FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS

Christina Carman-Nurse ("Plaintiff") initiated this lawsuit in state court, alleging that her former employer, Metropolitan District Commission ("the MDC" or "Defendant") violated her rights when it terminated her employment after she was injured and had difficulty returning to work. The MDC subsequently removed the case to this Court, and Ms. Carman-Nurse amended her Complaint, alleging violations of Connecticut's Workers' Compensation statutes, Conn. Gen. Stat. § 31-290a, the Family Medical Leave Act ("FMLA), 29 U.S.C. 2612 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

Currently pending before the Court are several motions: Defendant's motion to amend its answer, ECF No. 22; Defendant's motion to dismiss Count I, ECF No. 23; Defendant's motion for summary judgment on all counts, ECF No. 36; and Defendant's motion to strike portions of Plaintiff's response, ECF No. 48.

For the reasons stated below, the motion to amend is **GRANTED.** The motion to strike is **DENIED,** the motion to dismiss is **DENIED** as moot and the motion for summary judgment is **GRANTED** as to the FMLA and ADA claims. Because the dismissal of these claims deprives

1

the Court of subject matter jurisdiction, the Connecticut Workers' Compensation statute claim, the sole remaining claim, and this case are remanded to the Connecticut Superior Court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Ms. Carman-Nurse is a Connecticut resident and former employee of the MDC. Am. Compl. ¶¶ 2, 31, ECF No. 17. The MDC is a nonprofit municipal corporation that employs more than 75 employees and provides water, sewer, and waste collection services to a number of municipalities throughout Connecticut. *See* Answer ¶¶ 3-5, ECF No. 19.

### A.     Factual Background

Ms. Carman-Nurse first began working as a meter installer for the MDC in 1994. Def. 56(a)(1) Stmt. ¶ 1, ECF No. 38; Carman-Nurse Dep. at 34:10-16, Shea Aff., Ex. A, ECF No. 39-1. MDC fired Ms. Carman-Nurse, however, on November 3, 1997, after she allegedly lied to her supervisors. *See* Arb. Award, Shea Aff., Ex. S, ECF No. 39-19. After arbitration, MDC reinstated Ms. Carman-Nurse to her position on January 18, 2000. *See id.* Upon her reinstatement, Ms. Carman-Nurse returned as a clerk in the meter department and MDC subsequently hired her as a customer service representative in 2010.  Def. 56(a)(1) Stmt. ¶ 6; Carman-Nurse Dep. at 38:11-15.

### 1.     Job Requirements for Customer Service Representative Position

As a customer service representative, Ms. Carman-Nurse had to "respond[] to telephone inquiries and complaints by customers," "maintain[] and integrate[] water and sewer records and documents," and "type[] . . . correspondence, index cards, information on forms, reports, and statistics," and operate a computer. Analysis of Physical Req., Shea Aff., Ex. Q, ECF No. 39-17. The position reportedly required extensive time operating a computer, as well as occasional lifting, turning, twisting, reaching over-head, standing and stooping. *Id.*

In practice, Ms. Carman-Nurse claimed to receive approximately one hundred and thirty calls per day from customers. Carman-Nurse Dep. at 75:16-25. Most of these calls involved billing inquiries, which required retrieving and submitting data from the computer database after speaking with the customer through a headset. *See id.* at 77:2-24. After each call, Ms. Carman-Nurse prepared either a complaint or a log by inputting "a few words" into the computer related to each customer's inquiry. *Id.* at 75:16-25. These duties required Ms. Carman-Nurse to use both of her hands, a consistent requirement from 2012 to her termination in early 2016. *Id.* at 77:23-78:19, 83:1.

### 2. Ms. Carman-Nurse's Injury and Treatment

At some point during her employment, Ms. Carman-Nurse developed numbness, tingling and pain in her left hand and wrist, leaving her hand partially impaired. *See* Ashmead Treatment Note, Pl. Ex. 7 (documenting visit with physician on April 1, 2016). She experienced constant numbness and a sense of tightness in her fingers, and a loss of feeling in four of her five fingers. Ashmead Treatment Note at 1, ECF No. 46-14 (documenting visit with physician on January 20, 2015). Her hand appeared to hurt even with light contact. *Id.*

According to Ms. Carman-Nurse, she developed carpal tunnel syndrome from the consistent use of her hands, while using a computer as a clerk and customer service representative, along with her previous work as a meter installer. Carman-Nurse Dep. at 86:4-25. Shortly after she switched to the customer service representative position in 2010, Ms. Carman-Nurse brought in a chair to accommodate the symptoms and requested a new keyboard from her supervisor, Kimberly Haynes. Carman-Nurse Dep. at 90:2-91:12.

On December 3, 2014, Ms. Carman-Nurse filed a First Report of Injury with MDC to describe an injury sustained to her left hand and to initiate her claim for workers' compensation

benefits. Def. SMF ¶ 8; *see* Fillion Dep. at 45:12-20, Pl. Mem. In Opp., Ex. 6, ECF No. 46-6.

The First Report of Injury noted that Ms. Carman-Nurse's injury stemmed from the repetitive

and hand-intensive tasks required of Ms. Carman-Nurse as a customer service representative.

Def. 56(a)(1) Stmt. ¶ 8.

Ms. Carman-Nurse then began her treatment at Concentra Medical Centers[1] on December

5, 2014, and the facility released her on the same day with restrictions on the use of her left hand.

*See* Concentra Records, Pl. Mem. in Opp., Ex. 10, ECF No. 46-10. At her initial visit with

Concentra, the treating staff diagnosed Ms. Carman-Nurse's left hand injury as "tenosynovitis"

and recommended physical therapy treatment at Concentra from December 10, 2014, to January

8, 2015. *See* Concentra Records, Pl. Mem. In. Opp., Ex. 10.

After Concentra, two additional doctors diagnosed Ms. Carman-Nurse's condition as

carpal tunnel syndrome. Initially, on January 6, 2015, Dr. John Mara evaluated Ms. Carman-

Nurse and suggested surgical decompression, because the splint she had been using appeared to

be ineffectual. Mara Medical Report, Shea Aff., Ex. L, ECF No. 39-12. Ms. Carman-Nurse then

began treatment with Dr. Duffield Ashmead on January 20, 2015. Ashmead Report of Jan. 20,

2015, Pl. MSJ Mem. In Opp., Ex. 14, ECF No. 46-14; Letter to Dr. Ashmead, Pl. MSJ Mem. In.

Opp., Ex. 13, ECF No. 46-13. Dr. Ashmead also recommended a left carpal tunnel

decompression, which he performed on March 4, 2015. Def. 56(a)(1) Stmt. ¶ 16. Several months

later, Ms. Carman-Nurse had thumb surgery performed by Dr. Ashmead. Def. 56(a)(1) Stmt. ¶

17; Ashmead Dep., Def. 56(a)(1) Stmt., Ex. D, ECF No. 39-4.

---

[1] According to Cynthia Fillion, the MDC's Risk Service Analyst, an injured worker is required to seek treatment from Concentra for work-related injuries unless they receive authorization to change medical providers. Fillion Dep. at 23:2-16 and 26:2-17, Pl.'s Mem. In Opp., Ex. 6.

Both of these surgeries left Ms. Carman-Nurse disabled for several months. Def. 56(a)(1) Stmt. ¶¶ 16-17. Additionally, Ms. Carman-Nurse remained out of work for two further months, after she was scalded by hot coffee. Def. 56(a)(1) Stmt. ¶ 18.

### 3. Ms. Carman-Nurse's Leave

On December 29, 2014, MDC placed Ms. Carman-Nurse on leave. *See* E-mail from Robert Zaik to Cynthia Tower ("Zaik Email"), Pl.'s Mem. In Opp., Ex. 12, ECF No. 46-12 ("Upon directive, I have met with Christina to inform her that because we are concerned with the possibility of her aggravating the situation, we are allowing her to go home under Workers Comp . . . . ").

Robert Zaik, MDC's Manager of Labor Relations, stated that Ms. Carman-Nurse originally did not intend to take time off. He noted, however, that "we weren't going to allow her to work with a brace on and to attend physical therapy during our working hours." Zaik Dep. at 66:2-4. Zaik indicated that Ms. Carman Nurse therefore would not be allowed to work so long as these circumstances existed. Zaik Dep. at 65:25-66:4. Ms. Carman-Nurse ceased working on December 30, 2014, as a result, despite having returned to work at MDC with accommodations after her December 5, 2014, Concentra visit. *See* Ashmead Questionnaire, Shea Aff., Ex. K, ECF No. 39-11; Fillion Dep. at 55:15-56:8, Pl. Mem. In Opp., Ex. 6.

MDC expected Ms. Carman-Nurse to exhaust her sick leave and, then, "when she runs out of sick leave," "receive only the [workers' compensation] statutory payment." Zaik Email. Carman-Nurse never requested FMLA leave,[2] but MDC began tracking her leave under FMLA

---

[2] Ms. Carman-Nurse never requested FMLA leave related to her hand. Carman-Nurse Dep. at 59:8-11. Between 2011 and December 8, 2014, however, she had made approximately twelve FMLA requests for other purposes. Def. 56(a)(1) Stmt. ¶ 12; *see* FMLA Req.'s & Confirmation Letters, Zaik Aff., Ex. F, ECF No. 40-6. The most recent period was in December 2014, when she requested occasional FMLA leave — no more than one day per week for a seven month

on December 29, 2014. Zaik Aff. ¶ 24. On December 29, 2014, Mr. Zaik, sent an email to Erin

Ryan, MDC's Director of Human Resources. Zaik Email, Pl. Mem. In Opp., Ex. 12, ECF No 46-

12; Zaik Dep. 23:20-22 and 60:16-18, Pl. Mem. In Opp., Ex. 11, ECF No. 46-11. In the email,

Zaik stated that, "[u]pon directive," he had informed Ms. Carman-Nurse that due to the concern

of aggravating her injury, her work absences would be tracked concurrently as FMLA leave with

her sick leave and Workers' Compensation. Zaik Email, Pl.'s Mem. In Opp., Ex. 12.

MDC did not provide any written notice to Ms. Carman-Nurse that her leave would be

tracked as both workers' compensation and the FMLA, but Mr. Zaik alleges that he spoke to Ms.

Carman-Nurse about the FMLA tracking. Zaik Dep. at 69:6-9. He stated that, at the time, he did

not consider Ms. Carman-Nurse's injury to be a serious medical condition that would qualify her

for FMLA leave.[3] *Id.* at 75:16-19. However, although he "did not interpret it as a serious medical

condition," he tracked Ms. Carman-Nurse's under the FMLA because he said it was his "effort to

stem off this prior experience that we had with long-term absences with her." *Id.* at 76:1-5.

Ms. Carman-Nurse's treating physicians continually sustained her work restrictions. In

November 2015, for example, Dr. Ashmead stated that Ms. Carman-Nurse should be kept on

modified duty and not be able to lift, push, or pull more than five pounds. Nov. 24, 2015

Ashmead Report, Shea Aff., Ex. R, ECF No. 39-18. He also found that she should not do "hand

intensive/repetitive" work. *Id.*

MDC then referred Ms. Carman-Nurse to a physician they had retained. Caputo Report,

Zaik Aff., Ex. B, ECF No. 40-2. At that appointment, Ms. Carman-Nurse stated that she

_____

period — to care for her mother, who had been diagnosed with dementia. *Id.*; *see also* Carman-
Nurse Dep. at 57:1-17.
[3] MDC no longer contests whether Plaintiff's condition qualifies as a serious health condition.
Def. MSJ Br. at 25.

experienced "burning, painful discomfort" following her recent surgery and that therapy had not provided relief. *Id.* at 1. Dr. Caputo informed MDC that "[c]urrent work capacity would be no lift[ing], push[ing], or pulling or respective use [in the] left hand." *Id.* at 2. Furthermore, he noted that "[t]he resumption of full time, full duty employment would depend on residual relief on the current symptoms which at this time are quite bothersome. . . . Unfortunately, I cannot provide an exact time frame for full duty release relative to this as sometimes this could be a permanent problem limiting her ability to do full duty work permanently." *Id.*

On December 22, 2015, Dr. Ashmead examined Ms. Carman-Nurse again. He again concluded that she was unable to return to the essential functions of her job as he understood them. Ashmead Dep. 63:11-16, Shea Aff., Ex. D, ECF No. 39-4. In his treatment notes, Dr. Ashmead wrote that Ms. Carman-Nurse "reports profound difficulty using or engaging the thumb, even gently trying to move it is reportedly very painful." Ashmead Treatment Note, Shea Aff. Ex. I, ECF No. 32. He left "[e]xisting light duty restrictions" in effect. *Id.*

### 4.      Attempts to Return to Work

Following her surgery in July 2015, Ms. Carman-Nurse attempted to return to work. She "would go to the doctor" and then return to the MDC offices to see Mr. Zaik and, handing him the doctor's note, Ms. Carman-Nurse said " Bob, if there's anything I can do at work, to go back to work, I would do it." Carman-Nurse Dep. at 106:14-25. She claimed that "each time he would say, 'It's okay, Chris, you wait until you [are] a hundred percent.'" *Id.* at 106:24-25.

On January 11, 2016, MDC created a "Loss Run," which documents the cost of employees' injuries and relevant workers' compensation benefits. *See* Loss Run, Pl. Mem., Ex. 23, ECF No. 46-23. Ms. Carman-Nurse had the highest cost related to her benefits, a total of $82,582. *Id. see also* Deposition of Cynthia Fillion at 101:15-102:2, Pl. Suppl. Resp., Ex. A,

ECF No. 62-1. At some point, someone circled the indemnity figure for Ms. Carman-Nurse—which was $36,910—and wrote on the back of the document "60 Day Notice? Hearing this week." *Id.*

In a letter dated the same day, January 11, 2016, Mr. Zaik notified Ms. Carman-Nurse of a hearing scheduled for January 15, 2016, to review her employment status under the terms of her Collective Bargaining Agreement. Def. 56(a)(1) Stmt. ¶ 27; *see also* Letter from Robert Zaik to Christina Carman-Nurse (Jan. 11, 2016), Shea Aff. Ex. F, ECF No. 40-6. MDC notified Ms. Carman-Nurse that "a physician retained by the [MDC] has determined that you are unable to return to work in any capacity." The letter stated that she would be terminated unless the company received a "report form you which, in the District's opinion, [that] unconditionally confirms that you will be able to return to work in your present position within sixty (60) days of the date of the hearing." *Id.*

On January 15, 2016, MDC held a hearing. *See* Carman-Nurse Dep. at 113:3-7. She did not bring any documents to the meeting, but she did bring a card detailing an appointment scheduled for three days later. *Id.* Ms. Carman-Nurse "believed she would be able to get a report from him stating that she could return to work within the required time period." Zaik Aff. ¶ 14.

On January 18, 2016, Dr. Ashmead signed a summary note stating that Ms. Carmen-Nurse had been evaluated and could return to regular duty, with no restrictions, beginning on January 20, 2016. Ashmead Treatment Note, Shea Aff. Ex. H, ECF No. 39-8.

Dr. Ashmead also prepared a longer report stating that "Christina has indicated that she has been given an ultimatum by her employer: regular duty or she will be terminated. She would like to give it a try. Accordingly she is to call or return should questions or problems arise prior to further follow-up for a progress report, 2/19." Ashmead Treatment Note, Shea Aff. Ex. J, ECF

No. 33. Dr. Ashmead, however, stated that "[i]n the interim effective 1/20 she is released to regular duty as detailed separately." *Id.*

Ms. Carman-Nurse provided the summary note to Robert Zaik on January 19, 2016. Zaik Aff. ¶ 16. He understood the note to mean "that she could return to work within the required time period." *Id.*

In a letter dated January 21, 2016, Christopher Stone, an attorney for MDC, wrote to Dr. Ashmead regarding Ms. Carman-Nurse's claim, noting his prior opinion and that of Dr. Caputo, and stating that MDC had received "a copy of an unsigned report from you indicating that you had evaluated Ms. Carman-Nurse on January 18, 2016, and that as of January 20, 2016 she could return to regular duty with no restrictions." *See* Letter from Christopher Stone, Assistant MDC Counsel, to Duffield Ashmead, M.D., Stone Aff., Ex. A, ECF No 41-1. Mr. Stone requested that Dr. Ashmead "share with us the change in circumstances and/or facts" supporting his new conclusion, especially as "[h]er return to regular duty without restrictions will be based solely on your January, 2016 opinion and the facts supporting this opinion." *Id.*

Ms. Carman-Nurse then "hand-delivered" Dr. Ashmead's longer medical report, dated January 18, 2016, to Robert Zaik. Zaik Aff. ¶ 19.

### 5. Termination

On January 28, 2016, MDC sent a letter to Ms. Carman-Nurse terminating her employment. Letter from Robert Zaik to Christina Carman-Nurse, ECF No. 46-3. The letter summarized the various doctor reports that had been submitted. It stated that, although Ms. Carman-Nurse's treating physician had cleared her to work, "the report clearly states that your potential return to regular duty has nothing to do with your medical condition, which remained unchanged from the earlier referenced reports, both from your doctor and the independent

examiner." *Id.* MDC therefore concluded that "your employment relationship is being terminated" for failure to provide proper medical clearance. *Id.*

This lawsuit followed.

## B. Procedural History

Plaintiff's initial Complaint, filed in state court, included three counts: Count I alleged retaliation and wrongful termination in violation of Conn. Gen. Stat. § 31-290a; Count II alleged interference in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612, *et seq*; and Count III alleged retaliation in violation of the FMLA. *See* Compl., ECF No. 1-1.

MDC removed the case from state court, invoking this Court's federal question jurisdiction under 28 U.S.C. § 1331. Notice of Removal at 2, ECF No. 1. Ms. Carman-Nurse then filed an Amended Complaint. Am. Compl. ECF No. 17. The Amended Complaint renewed Ms. Carman-Nurse's allegations of retaliation and wrongful termination in violation of Conn. Gen. Stat. § 31-290a, and interference and retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2612, *et seq.* It also added a fourth count, alleging a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

On April 6, 2017, MDC filed its Answer. Answer, ECF No. 19. Six months later, in October 2017, MDC moved for leave to file an Amended Answer, arguing that the Court did not possess subject matter jurisdiction over Count I of the Amended Complaint. Mot. for Leave to File Am. Answer, ECF No. 22.

On the same day, MDC also filed a partial Motion to Dismiss Count I of the Amended Complaint. Def. Mot. to Dismiss, ECF No. 23. It argued that Count I "alleges solely that the [MDC] failed to provide the plaintiff suitable work," a claim for which Conn. Gen. Stat § 31-313, rather Conn. Gen. Stat.§ 31-290a, and that the claim therefore must proceed before

Connecticut's Workers' Compensation Commission. *Id.* Ms. Carman-Nurse opposed the motion to dismiss arguing that she had properly pleaded a retaliation claim and that the Court maintained subject matter jurisdiction. Pl. Obj., ECF No. 25.

Before the Court ruled on the motion to dismiss, discovery closed and MDC moved for summary judgment on all counts. *See generally* Def. Mot. for Summ. J., ECF No. 36; Def. Mem. of Law in Support ("Def. MSJ Br."), ECF No. 37. MDC argues that Ms. Carman-Nurse failed to state a *prima facie* case for each of the discrimination and retaliation claims and that she was unable to return to work. MDC therefore argues that, even had Ms. Carman-Nurse stated a *prima facie* case, it had a legitimate, non-retaliatory reason for terminating her employment.

Ms. Carman-Nurse opposes the motion for summary judgment. She argues that MDC "consistently ignores the virtual mountain of 'smoking-gun' evidence that it unlawfully retaliated against Plaintiff . . . ." Pl. MSJ Resp. Br. at 2, ECF No. 46. She also claims that there are continued issues of material fact "with respect to each and every element of every claim at issue" which would be "sufficient for the causes of action to be properly submitted to a jury." *Id.*

Finally, MDC moved to strike passages from Ms. Carman-Nurse's brief. Def. Mot. to Strike, ECF No. 48. MDC argues that the plaintiff had cited to a draft letter that MDC employees had sent to legal counsel for review. *Id.* at 1. This letter, MDC claims, is protected by attorney-client privilege and was disclosed accidentally. MDC argues that, because MDC had attempted to claw back the letter, Ms. Carman-Nurse had to seek a court ruling before citing the letter and therefore any reference should be stricken from her brief. *Id.* at 6.

Ms. Carman-Nurse objects to the motion to strike on two grounds. *See* Pl. Obj., ECF No. 52. First, she argues that the letter is not privileged at all. Second, and alternatively, she argues

that MDC has waived the privilege by failing to object to the letter's use, until after she had relied on it in one deposition and tried to raise it in a second deposition.

## II.     Standard of Review

### A.     Motion to Amend Pleadings

A party may amend its pleading only with the opposing party's written consent or the court's leave" after the period for amendment as of right has expired. FED. R. CIV. P 15(a)(2) "The court should freely give leave when justice so requires." *Id.* Leave might be denied on grounds of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### B.     Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure allows parties to move to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f), however, only applies to pleadings, and not to briefing in support or opposition to a motion. *O'Brien v. Wisniewski*, No. 3:10-CV-120 CSH, 2012 WL 1118076, at *3 (D. Conn. Apr. 3, 2012) ("Similarly, 'a reply memorandum is not a pleading.' . . . Thus, neither the assertions in plaintiff's counsel's reply brief, nor the exhibits attached thereto, are "pleadings" from which the Court might properly strike material under Rule 12(f)") (quoting *Marshall v. Webster Bank,* N.A., No. 3:10–cv–908 (JCH), 2011 WL 219693, at * 12 (D. Conn. Jan. 21, 2011)); *see also* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1380 (3d ed.) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f).").

Additionally, a motion to strike "is improper with respect to summary judgment." *McKinney v. Dzurenda*, No. 3:10-cv-880 AVC, 2013 WL 1296468, at *1 (D. Conn. Mar. 27, 2013); *see also Ferraresso v. Town of Granby,* 646 F. Supp. 2d 296, 301 (D. Conn. 2009) ("Because the Court may consider only admissible evidence in ruling on summary judgment, it sees no need to "strike" any portions of Ferraresso's submissions.").

### C.      Motion to Dismiss

In evaluating a motion under Rule 12(b)(1) for lack of subject matter jurisdiction, a court "must accept as true all material factual allegations in the complaint but need not draw inferences favorable to the party asserting jurisdiction." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). The plaintiff bears the burden of showing that subject matter jurisdiction is proper based on facts existing at the time he or she filed the complaint. *Scelsa v. City Univ. of New York*, 76 F.3d 37, 40 (2d Cir. 1996) (citations omitted).

### D.      Motion for Summary Judgment

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact remain in dispute, and that it is thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc*., 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor

of the opposing party on the issue on which summary judgment is sought, summary judgment is inappropriate. *See Security Insurance Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Anderson,* 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict").

In determining whether summary judgment is appropriate, a court must consider only admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence") (citation and internal quotation marks omitted); FED. R. CIV. P. 56(e).

## III.    DISCUSSION

The Court must rule on the following motions: (1) MDC's motion to amend its Answer to add an additional defense; (2) MDC's motion to dismiss Count I of the Amended Complaint; (3) MDC's motion for summary judgment on all counts; and (4) MDC's motion to strike a portion of the Plaintiff's response brief. The Court addresses each motion in turn.

### A.    Procedural Motions

Two pending motions must be resolved before the Court turns to the motion to dismiss and the motion for summary judgment. First, MDC has moved to amend its Answer. Second, it has moved to strike passages from Ms. Carman-Nurse's memorandum in opposition to summary judgment.

#### 1.    Motion to Amend Answer

MDC moves to amend its Answer and add a defense based on lack of subject-matter jurisdiction. Here, Ms. Carman-Nurse has not opposed leave to amend. *See* D. Conn. L. R. 7(a)(2) ("Failure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion, except where the pleadings provide sufficient grounds to deny the

motion."); *Lopez v. City of New York*, 901 F. Supp. 684, 686 (S.D.N.Y. 1995) ("The motion for leave to amend is unopposed and therefore granted and the proposed pleading deemed interposed.").

The motion to amend therefore is granted, and the case will proceed with the Amended Answer.

### 2.      Motion to Strike

MDC also moves to strike a paragraph and footnote from Ms. Carman-Nurses response brief, arguing that the section references a document protected by attorney-client privilege and that defense counsel inadvertently disclosed the document to opposing counsel during discovery. *See* Mot. to Strike at 1. Ms. Carman-Nurse argues that the document is not privileged and, even if it were, MDC has waived privilege.

The admissibility of evidence, however, can be addressed through the summary judgment briefing, not in separate motion practice. *See, e.g.*, *Ferraresso*, 646 F. Supp. 2d at 301 ("If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing."); FED. R. CIV. P. 56 advisory committee's note ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike.").

MDC had an opportunity to address Ms. Carman-Nurse's reliance on the document in its reply brief, especially considering the Court granted leave to file excess pages. *See* Order, ECF No. 51. It chose not to do so, only noting the conflict and stating it had filed a motion to strike. Def. MSJ Rep. at 5.

The motion to strike therefore is denied.[4]

**B.     Motion to Dismiss Count I of the Amended Complaint**

After discovery had begun, MDC moved to dismiss Count I of the Amended Complaint for lack of subject-matter jurisdiction under FED. R. CIV. P. 12(b)(1). In Count I, Ms. Carman-Nurse alleges that MDC fired her "because she suffered a work-related injury, sought and received benefits under the workers' compensation statutes, and despite the fact that Plaintiff was ready, willing, and able to return to work . . . . "  Am. Compl. at 5 (citing Conn. Gen. Stat. § 31-290a).

MDC argues that Ms. Carman-Nurse "alleges solely that the District failed to provide the plaintiff suitable work" in violation of Conn. Gen. Stat. § 31-313." Section 31-313 claims, however, require exhaustion before the Workers Compensation Commission. MDC argues, therefore, that because Ms. Carman-Nurse did not exhaust the available remedies under § 31-313, the Court must grant their motion to dismiss. *See* Def. Mem. in Supp. of Mot., ECF No. 24.

In response, Ms. Carman-Nurse asserts that she is "*not* attempting to convert a claim under [§ 31-313] into a § 31-290a retaliation claim."  Pl. Mem. in Opp. to Def.'s Mot. 8, ECF No. 25-1. Rather, Ms. Carman-Nurse argues that Count I is brought appropriately as a retaliation claim under § 31-290a. *Id.* Ms. Carman-Nurse points to her alleged notification of her work injury to MDC, initiating a workers' compensation claim, seeking and receiving medical treatment, seeking available light duty work, and being terminated upon providing the District with a full-duty medical release. *Id.*

---

[4] Because no part of this decision rests on the admissibility of the letter, the Court need not and does not decide that issue.

Because, as discussed further below, the Court has decided to dismiss all federal claims in this lawsuit, and remands the case to Connecticut Superior Court, the motion to dismiss for lack of subject-matter jurisdiction, due to a state law issue is denied as moot.

### E.    Motion for Summary Judgment

MDC has moved for summary judgment on all counts. *See generally* Def. Mot. for Summ. J., ECF No. 36; Def. MSJ Mem. MDC argues that summary judgment is warranted on the FMLA and Workers' Compensation retaliation claims (Counts I and III) because Ms. Carman-Nurse has failed to state a *prima facie* case of retaliation in both counts and MDC has provided a legitimate, non-retaliatory reason for terminating her employment. It also argues that it was permitted to count Ms. Carman-Nurse's leave twice, and that any error in notice under the FMLA would be harmless. Finally, with respect to the ADA claim, MDC argues that Ms. Carman-Nurse was not disabled, that she failed to request a reasonable accommodation, and that she could not perform the essential functions of her position, with or without a reasonable accommodation.

Because the resolution of the federal claims may result in the Court lacking subject-matter jurisdiction over this lawsuit, the Court addresses the FMLA and ADA claims first. A review of these claims result in their dismissal. Her FMLA interference and retaliation claims fail for essentially the same reason: her medically excused absence from work for over a year far exceeded any leave required under FMLA. MDC could not have interfered with her right to leave under the FMLA because the record evidence makes clear that Ms. Carman-Nurse could not have structured her leave differently given the extent of her medical condition. MDC also could not have retaliated against Ms. Carman-Nurse under the FMLA by terminating her because her right to return to her job under the FMLA had long since expired.

As to Ms. Carman-Nurse's ADA claim, because the record lacks evidence of Ms. Carman-Nurse's ability to do the essential functions of the job, she has failed to meet her burden to demonstrate what reasonable accommodations MDC could have provided under the ADA. This is fatal to her ADA claim.

Having dismissed, as discussed below, both federal claims, the Court no longer has subject-matter jurisdiction over Ms. Carman-Nurse's Connecticut's Workers' Compensation statute claim and therefore, remands the case to the Connecticut Superior Court.

### 1.    The FMLA Claims

The Family Medical Leave Act, or FMLA, "was enacted to remedy discrimination against workers who also had significant family responsibilities." *Serafin v. Connecticut*, No. 3:98-cv-398 (CFD), 2005 WL 578321, at *4 (D. Conn. Mar. 9, 2005). The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C.A. § 2601(b)(1). "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1–year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 86 (2002). At the end of this twelve-week period, an employee has the right to return to her position if she is able to perform the essential functions of the position. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006).

Along with its substantive protections, the FMLA also provided plaintiffs with a private right of action to enforce their rights. *Id.* Ms. Carman-Nurse seeks relief under FMLA based on two theories: interference and retaliation.

## A.      FMLA Interference Claim

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (citing 29 U.S.C. § 2615 (a)(1)). Unlike in FMLA retaliation claims, *see infra* Section IV.C., the "employer's subjective intent is not an issue" and "the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA—for example, a twelve-week period of leave or reinstatement following a medical leave." *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014).

In order to defeat a motion for summary judgment on a FMLA interference claim, "a plaintiff must establish: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio,* 817 F.3d at 424.

Ms. Carman-Nurse claims that MDC interfered with her rights under the FMLA by "requir[ing] her to take more FMLA leave than necessary" and "fail[ing] to restore her to the position of employment she held, or an equivalent position, when such leave expired[.]" Am. Compl. at 7. MDC argues that Ms. Carman-Nurse failed to establish a *prima facie* case of interference "absent evidence that she was denied any rights to which she was entitled to under the FMLA." Def. MSJ Mem. at 24. The Court agrees.

The first three requirements are undisputed. First, an employee is covered under the FMLA if she worked "a total of at least 12 months by the employer on the date on which any FMLA leave is to commence." 29 C.F.R. § 825.102.

Second, the FMLA defines covered employers as "any person engaged in commerce or in any industry or activity affecting commerce, who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 C.F.R. § 825.104. MDC employs 75 people. *See* Answer ¶¶ 3-5, ECF No. 19.

Third, while Mr. Zaik originally did not believe that Ms. Carman-Nurse's injury qualified as a "serious medical injury" under the FMLA, MDC concedes it does. Def. MSJ Mem. at 25 n. 7 ("The plaintiff alleged that she had a qualified medical condition under the FMLA. . . . and the District does not dispute the fact that the plaintiff's injury to her left hand/wrist in December 2014 constituted a serious health condition as defined by the FMLA."). Ms. Carman-Nurse therefore is entitled to take leave.

MDC also does not explicitly challenge whether Ms. Carman-Nurse has demonstrated that she meets the fourth requirement to provide MDC notice of her intention to leave. It notes, however, that Ms. Carman-Nurse only sought intermittent FMLA leave to care for her mother, and that "plaintiff further testified that she did not request any leave under the FMLA in connection with the injury to her left hand/wrist." Def. MSJ Mem. at 25. But, a plaintiff is not required to request FMLA leave specifically for notice to be sufficient. *Cf. Coutard v. Mun. Credit Union*, 848 F.3d 102, 111 (2d Cir. 2017) ("Rather, in the absence of a request for additional information, an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA may apply."). And, MDC felt it had been placed on notice

that Ms. Carman-Nurse intended to take leave that might implicate FMLA, given that the company chose to run her FMLA leave concurrent with her workers compensation absence. *See* Def. MSJ Mem. at 25. MDC also does not dispute whether her injuries would qualify as a medical condition as defined by the FMLA. Def. MSJ Mem. at 25 n.7.

MDC instead focuses on the fifth requirement, *see* Def. Mem. at 24 ("[T]he plaintiff does not come close to demonstrating a prima facie case for a claim of FMLA interference here, where she admits that she was never denied her rights to FMLA leave."), raising several arguments as to why it is entitled to summary judgment. First, MDC claims to have properly tracked Ms. Carman-Nurse's leave concurrently with her leave for workers' compensation. *Id.* at 25 (citing Conn. Agencies Reg. § 31-51qq-18 and 29 C.F.R. § 825.207(e)). Second, MDC argues that it "did not have an obligation to restore her to her position at the time that her leave expired" because "she was rendered totally disabled at that time." *Id.* at 26 (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir.1999)). Third, and relatedly, MDC argues that any failure in its notification procedures was harmless. Def. MSJ Rep. Br. at 11 (citing 29 C.F.R. § 825.301(e)).

In response, Ms. Carman-Nurse argues that "leave counting against an employee's FMLA allotment is conditioned upon the employer first meeting the notice requirements set out in the FMLA." Pl. MSJ Mem. at 28. She argues that no leave between December 2014 and January 2016 could be properly counted as FMLA leave because she claims MDC failed to give her proper notice under 29 C.F.R. § 825.300(d). *Id.* Finally, she argues that she provided adequate notice that she could return to work and, despite this notice, MDC failed to reinstate her. *Id.* at 29.

As both parties appear to acknowledge, the mere fact that the leave was characterized as both workers' compensation and FMLA did not violate Plaintiff's rights under either. But the regulations presume that the leave be properly designated "in accordance with § 825.300(d)[.]" 29 C.F.R. § 825.207(e). In order for MDC to have properly cross-designated her leave, it was required to "inform the employee of this designation at the time of designating the FMLA leave." 29 C.F.R. § 825.300(d)(1). The designation must be in writing. *Id.* § 825.300(d)(5).

Additionally, the "employer must notify the employee of the amount of leave counted against the employee's FMLA leave entitlement." *Id.* § 825.300(d)(6). This notification can be oral or writing, but "[i]f such notice is oral, it shall be confirmed in writing, no later than the following payday . . . ." *Id.*

Mr. Zaik acknowledges that no written notice was provided to Ms. Carman-Nurse. Zaik Dep. at 69:6-9. There is nothing in the record suggesting that MDC sent Ms. Carman-Nurse a proper written designation, or informed her in writing how much of her leave entitlement would be counted against her.

The governing regulations state that "[f]ailure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights. An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered." 29 C.F.R. § 825.300(e).

As a result, if "there is a genuine issue of material fact as to whether the notice violation 'constituted an interference with, restraint, or denial of the exercise of plaintiff's FMLA rights,' for instance, whether the plaintiff would have taken unpaid FMLA leave had she been properly

notified about the policy regarding restoration of tenure," *De Oliveira v. Cairo-Durham Cent. Sch. Dist.*, 634 F. App'x 320, 322 (2d Cir. 2016) (quoting 29 C.F.R. § 825.300(e)) (internal alterations omitted), then summary judgment would be inappropriate. *See Rengan v. FX Direct Dealer, LLC*, No. 15-CV-4137, 2017 WL 3382074, at *9 (S.D.N.Y. Aug. 4, 2017) ("There are genuine issues of material fact about the nature and circumstances of the notices provided to the plaintiff and whether those notices allowed the plaintiff to make an informed decision to structure her leave in a manner that would ensure her successful return to work."). As further discussed below, that is not the case here.

### ii.    Harmless Error

MDC suggests that Ms. Carman-Nurse "was absent for the duration of the relevant period due to a health condition and remained medically restricted." Def. MSJ. Rep. Br. at 11. It therefore argues the failure to provide notice is harmless because "the employee's own serious health condition prevented him or her from returning to work during that time period regardless of the designation." *Id.* (quoting 29 C.F.R. § 825.301(e)).

In deciding whether MDC's actions were harmless, it is useful to compare Ms. Carman-Nurse's claims with those in *Blackett v. Whole Foods Mkt. Grp., Inc.*, No. 3:14-cv-01896 (JAM), 2017 WL 1138126 (D. Conn. Mar. 27, 2017). In *Blackett* the Court concluded that "a reasonable jury could conclude that plaintiff would have attempted to structure his leaves in order to preserve his right to reinstatement." 2017 WL 1138126, at *7. The defendant, like here, argued that the plaintiff was unable to return following the conclusion of the federal-mandated leave and therefore when it failed to provide proper notice, that error would be harmless. *Id.* But, the court noted that the plaintiff might have chosen to manage his surgeries and injuries differently or, at the very least, a jury should determine "if he would have been medically able to structure his

leaves differently in order to avail himself of his FMLA rights notwithstanding his several severe and unplanned medical conditions." *Id.* (citing *Reid-Falcone v. Luzerne Cnty. Comm. College*, 2005 WL 1527792, at *5–6 (M.D. Pa. 2005)).

Unlike this case, however, the plaintiff in that case "might have attempted to return to work earlier from his first leave, or he might not have acquiesced in taking his second leave—a forced leave—for lack of light duty work, and insisted that he was fit for duty had he known that it would have exhausted his state and federal FMLA allotments." *Id.* at 8.

This record contains no such evidence. In fact, on this record, Ms. Carman-Nurse had consistent medical documentation keeping her out of work from the end of December 2014 until, at least, the middle of December 2015. *See, e.g.,* Ashmead Treatment Note, Shea Aff. Ex. I, ECF No. 32 (noting that Ms. Carman-Nurse "reports profound difficulty using or engaging the thumb, even gently trying to move it is reportedly very painful"). As a result, given the length of her medically justified absence from work during this time period alone, no "reasonable jury could conclude that plaintiff would have attempted to structure [her] leaves in order to preserve [her] right to reinstatement." *Blackett*, 2017 WL 1138126, at *7; *see also Wanamaker*, 11 F. Supp. 3d at 69 ("[T]he issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA—for example, a twelve-week period of leave or reinstatement following a medical leave.").

Defendant's motion for summary judgment therefore is granted with respect to Count II of the Amended Complaint.

## 1.    FMLA Retaliation Claim

Ms. Carman-Nurse also claims that MDC retaliated against her for exercising her rights under the FMLA. MDC moves for summary judgment, arguing that Ms. Carman-Nurse has

failed to state a *prima facie* case of retaliation and that MDC has provided a legitimate, non-retaliatory reason for terminating her employment. *See* Def. MSJ Br. at 27.

Claims for retaliation under the FMLA are evaluated under the well-established burden-shifting analysis first developed in the Title VII context. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (noting "the retaliation analysis pursuant to *McDonnell Douglas* [*Corporation v. Green*, 411 U.S. 792 (1973)] is applicable" to retaliation claims).

First, the plaintiff bears the burden of establishing a *prima facie* case of retaliation. *Potenza*, 365 F.3d at 168. For a claim of retaliation in violation of the FMLA, the plaintiff must establish: "(1) [s]he exercised rights protected under the FMLA; (2) [she] was qualified for [her] position; (3) [she] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.*

Second, "[i]f the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429.

### a.    Prima Facie Case under the FMLA

With respect to the FMLA claim, MDC argues that Ms. Carman-Nurse never filed for FMLA leave for her hand, and therefore did not exercise her rights, Def. MSJ Br. at 28, even though MDC placed her on leave, and she was qualified for that leave. As a result, Ms. Carman-Nurse exercised her FMLA rights under the act, whether she initially sought leave.[5] *Cf. Dighello v. Thurston Foods*, Inc., 307 F. Supp. 3d 5, 16 (D. Conn. 2018). ("[U]nder the FMLA, the employer's duties are triggered when the employee provides enough information to put the

---

[5] It also argues that she was not able to perform her job. This argument is addressed more fully below.

employer on notice that the employee may be in need of FMLA leave.") (quoting *Tambash v. St. Bonaventure Univ*., No. 99CV967, 2004 WL 2191566, at *10 (W.D.N.Y. Sept. 24, 2004)). Because MDC terminated her following that leave, Ms. Carman-Nurse has established that there was an adverse action. *Vega,* 801 F.3d at 85 (noting termination as one paradigmatic adverse employment action).

### b.    Causal Connection and Retaliatory Intent

The viability of Ms. Carman-Nurse's retaliation claim rests on whether there is a causal connection between Ms. Carman-Nurse's termination and any potential retaliation or retaliatory intent. MDC argues that plaintiff does not meet her burden with respect to the retaliatory intent or causal connection. It argues that—because Ms. Carman-Nurse was fired months after her FMLA leave expired—she cannot show temporal proximity that would give rise to an inference of retaliatory intent. Def. Br. at 29. The Court agrees.

In order to state a *prima facie* case at summary judgment, a plaintiff must demonstrate "a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Sista*, 445 F.3d at 177 (denying leave to amend for claims involving FMLA and ADA retaliation) (internal citations omitted). Ms. Carman-Nurse has not put enough evidence in the record to establish a causal connection.

One way of establishing a causal connection is by demonstrating temporal proximity. *See, e.g.*, *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (reversing grant of summary judgment where plaintiff had demonstrated temporal proximity and the evidence provided "a sufficient basis to send the question of the school district's retaliatory intent to the jury to reach a final determination.").

Here, the protected activity was not followed closely by discriminatory treatment. Ms. Carman-Nurse went on FMLA leave on December 29, 2014. She was not terminated until over one year later in January, 2016, well after her twelve weeks of permitted leave would have expired. *See* Letter from Robert Zaik to Christina Carman-Nurse (terminating employment on January 28, 2016). Even if the Court were to count from the end of her leave, there would still be an eight-month gap. Courts generally have found that such gaps do not establish causation. *See, e.g.*, *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (noting "claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation" and collecting cases); *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962 JFB AKT, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

A large gap between the protected action and termination, even if substantial, may still support an inference of retaliation, especially "where there is other evidence of retaliation. *Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 240 (D. Conn. 2006).

The other potential evidence of discrimination here is the "loss run" that MDC had completed shortly before firing Ms. Carman-Nurse. *See* Deposition of Cynthia Fillion at 101:15-102:2, Pl. Suppl. Resp., Ex. A, ECF No. 62-1. The handwriting on the loss run—noting the 60-day hearing and ensuring that termination was imminent—suggests a relationship between Ms. Carman-Nurse's termination and her receipt of workers' compensation benefits. In short, the cost of her workers' compensation benefits under state law arguably prompted her termination and may provide evidence probative of retaliatory animus. *Cf. Dupree*, 462 F. Supp. 2d at 240

(holding, in § 31–290a case, that evidence that insurance rates increased for defendant as a result of plaintiff's workers' compensation claim provided evidence of retaliatory motive).

Nevertheless, while perhaps probative of Ms. Carman-Nurse's workers compensation retaliation claim, the loss run data is not probative of her FMLA retaliation claim. By the time the loss run data related to the costs of her workers' compensation benefits had been produced, Ms. Carman-Nurse had completely exhausted her FMLA leave. *See* Fillion Dep 104:6-11 (testifying to producing this particular loss run data because she "was asked to do these dates" by human resources).

As a result, Ms. Carman-Nurse has "failed to present sufficient evidence from which a reasonable jury could conclude that [MDC] terminated [her] on account of [her] decision to exercise [her] rights under the . . . FMLA," summary judgment is appropriate on her FMLA retaliation claims. *Sista*, 445 F.3d at 177.

### 3. Count IV: ADA Discrimination

Ms. Carman-Nurse also claims that MDC violated the Americans with Disabilities Act ("ADA"). She pursues several separate theories. First, she claims discrimination because either she is disabled within the meaning of the ADA, or her employer perceived her to be disabled. Pl. MSJ Resp. Br. at 31-33. She argues that MDC fired her on account of its perception of her as disabled. Pl. MSJ Resp. Br. at 38. Her primary argument, however, is that MDC failed to give her reasonable accommodations for her disability or should have engaged in an interactive process. Pl. MSJ Resp. Br. at 35-37.

MDC has moved for summary judgment, arguing that Ms. Carman-Nurse has not demonstrated she is disabled within the meaning of the ADA, Def. MSJ Mem. at 32-33, has

failed to request a reasonable accommodation, *id.* at 35-36, and that she could not perform the essential functions of her position, with or without reasonable accommodation. *Id.* at 37.

As with the FMLA and workers' compensation claims addressed above, ADA discrimination claims are subject to the burden-shifting scheme articulated in *McDonnell Douglas*. *See McMillian v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). A plaintiff may demonstrate a *prima facie* case if she can show "by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability." *Id.* (quoting *Sista*, 445 F.3d at 169).

Ms. Carman-Nurse's claim, as she plead it in her Amended Complaint, is primarily a failure-to-accommodate claim. *See* Am. Compl. ¶ 33 ("Defendant discriminated against Plaintiff on account of her disabilities in violation of the ADA insofar as it failed entirely to engage in the interactive process to determine whether Plaintiff could perform the essential functions of her position . . . ."); *see also* Pl. Mem. at 35-37 (describing alleged failure to accommodate).

In the Second Circuit,

> A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

*McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir.2006)).

For both failure-to-accommodate and adverse employment action claims, the plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation

that would allow [the plaintiff] to perform the essential functions of [the plaintiff's] employment." *McMillan*, 711 F.3d at 126 (quoting *McBridge*, 583 F.3d at 97).

Ms. Carman-Nurse has failed to meet the respective burdens on either her termination theory or her failure-to-accommodate claim.

### a.      Disability under the ADA

In order to be disabled under the ADA, an individual must have "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2).

Ms. Carman-Nurse points to working, an activity alleged to be substantially limited by her carpal tunnel. Def. 52(a)(1) Stmt. ¶¶ 62-63 (noting Plaintiff's testimony that she was limited in opening jars, horseback riding, and working with heavy machinery). Working is listed as one of the major life activities and Ms. Carman-Nurse would be disabled within the meaning of the ADA, if she were unable to work. *Cf. Biancamano v. Special Metals Corp*., No. 7:12-cv-1825 (GTS)(DEP), 2013 WL 4082721, at *3–4 (N.D.N.Y. Aug. 13, 2013) ("Here, it is alleged that plaintiff was forced to stop working as a result of his carpal tunnel and ulnar nerve damage in his left arm in August 2010. . . . Because working is a major life impairment under the ADA, plaintiff's complaint alleges facts plausibly suggesting that he suffers from an impairment that satisfies the definition of disability.").

Therefore, a jury could certainly determine that Ms. Carman-Nurse is limited in one or more major life activity.[6]

Second, in order to meet the definition, Ms. Carman-Nurse must show that she has either a record of impairment or has been "regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). "An individual meets the requirements of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." U.S.C. § 12102(1)(C).

In interpreting this provision, the Second Circuit has held that a plaintiff is "only required to raise a genuine issue of material fact about whether [the defendants] regarded him as having a mental or physical impairment." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012). A plaintiff is "not required to present evidence of how or to what degree they believed the impairment affected him." *Id.*

On this record, MDC perceived Ms. Carman-Nurse as having a physical disability, that is: they perceived her to be limited in her ability "to return to work in any capacity." Letter from Robert Zaik to Christina Carman-Nurse (Jan. 11, 2016), Shea Aff. Ex. F, ECF No. 40-6;

---

[6] The Court notes that here, the parties' arguments under Ms. Carman-Nurse's FMLA, Workers' Compensation, and the ADA claims appear to collide. MDC argues that Ms. Carman-Nurse is unable to perform her job functions and return to work, but not impaired in a major life activity. *Compare* Def MSJ Mem. at 20 ("It cannot be seriously disputed that the District was unable to return the plaintiff to her customer service position, which required that she perform the very activities that cause her symptoms in the first place") with *id*. at 33 (stating Plaintiff "has no claim of any major life activity which has been substantially limited by the injury to her left hand/wrist"). Ms. Carman-Nurse argues that she was able to work, but yet still substantially impaired in a major life activity. Compare Pl. MSJ Resp. Br. at 28 ("It is undisputed here that, on numerous occasions, Plaintiff notified MDC that she was capable of returning to work") with *id*. at 32 (arguing that Plaintiff was both substantially impaired and that she was perceived to be impaired by Defendants).

*Biancamano*, 2013 WL 4082721, at *4 (noting, on a motion to dismiss that "it is alleged that plaintiff was forced to stop working as a result of his carpal tunnel and ulnar nerve damage in his left arm in August 2010" and that "[b]ecause working is a major life impairment under the ADA, plaintiff's complaint alleges facts plausibly suggesting that he suffers from an impairment that satisfies the definition of disability.").

### b.    Essential Function

Ms. Carman-Nurse bears the burden of proving, by a preponderance of the evidence, that she is capable of performing the essential functions of her job. *See McMillian*, 711 F.3d at 125. MDC argues that that Ms. Carman-Nurse's position required extensive typing, answering the phone and filing out forms by hand. Def. MSJ Mem. at 34-35. Also, "[t]he job description also contained an analysis of physical requirements, which noted that the only 'extended' physical requirement of the customer service representative position was 'constant operation of PC terminal'" *Id.* at 35. Within the Second Circuit, "[c]ourts 'must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position . . . .'" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (quoting *Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003)).

As a result, typing is an essential function of Ms. Carman-Nurse's job. *McMillan*, 711 F.3d at 126 (requiring "a fact-specific inquiry into both the employer's description of the job and how the job is actually performed in practice"). Here the record testimony clearly establishes that Ms. Carman-Nurse was responsible for answering the phone and typing summaries of each call. While the parties differ on exactly how many calls Ms. Carman-Nurse had to address each day, both parties acknowledge that her role required her to sit, answer the phone, and "enter brief

notes concerning phone calls" as well as "posting, tabulating, or calculating data." Pl. MSJ Resp. Br. at 35.

Ms. Carman-Nurse's ADA claims fail, however, because she has not placed any evidence in the record of a possible accommodation that would have allowed her to perform the essential functions of her job. As addressed above, in both adverse employment action claims and failure-to-accommodate claims, the plaintiff bears both the burdens of production and of persuasion as to the existence of some accommodation. *McMillan*, 711 F.3d at 126. If the accommodation is to transfer to a different position, she must either provide evidence "of an accommodation that would have allowed her to perform the essential functions of her pre-disability position" or "identify a suitable position to which she could have been transferred." *McBride*, 583 F.3d at 97.

Courts in the Second Circuit regularly grant summary judgment where a plaintiff fails to meet her burden of production and persuasion as to a reasonable accommodation. *See, e.g.*, *Petrone v. Hampton Bays Union Free Sch. Dist.,* 568 Fed. App'x 5, 8 (2d Cir. 2014) ("This is strong evidence that an accommodation of an extended leave of absence would not have been an undue hardship for the District, *see* 42 U.S.C. § 12111(10), but Petrone never met his initial burden to show that the accommodation was reasonable—that is, that it would have allowed him to return to work."); *Mainella v. Golub Corp*., No. 1:15-cv-1082 (FJS) (DJS), 2018 WL 1587049, at *7 (N.D.N.Y. Mar. 28, 2018) (granting summary judgment on discrimination and failure-to-accommodate claims because "Plaintiff Christine M. has failed to produce any evidence of a reasonable accommodation that would have allowed her to perform immunizations at the time of her dismissal").

Ms. Carman-Nurse has admitted she has not met her burden. *See, e.g.*, Pl. 56(a)(2) Stmt. ¶ 57 ("Admit that Plaintiff does not have a full understanding of each and every position which

MDC had available, and which could have been offered as an means of reasonably accommodating her, as MDC failed entirely to engage in the interactive process."). This concession alone necessitates granting summary judgment with respect to the Plaintiff's ADA claims.

Plaintiff argues, however, that MDC is liable because it failed to engage in an interactive process: "the law imposes upon Defendant an affirmative duty to ascertain whether positions existed which Plaintiff was capable of performing, and actively engage in efforts to keep her employed." Pl. Mem. at 36-37. The Court disagrees.

In *McBride*, the plaintiff also argued "that her failure to identify an accommodation of any form that would have allowed her to continue employment at BIC should be excused in light of BIC's purported failure to engage in a sufficient interactive process intended to develop a mutually agreeable accommodation of her disability." *McBride*, 583 F.3d at 99. The Second Circuit rejected that argument, noting that the ADA places liability on refusing to make a feasible accommodation, "not mere refusal to explore possible accommodations where, in the end, no accommodation was possible." *Id.* at 100.

Ultimately, the Second Circuit held that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." *Id.* at 101. "The employer's failure to engage in such an interactive process, however, does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible." *Id.*; *see also Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017)

("Therefore, there is no valid independent claim under the ADA for failure to engage in an interactive process.").

Ms. Carman-Nurse thus has failed to put any information in the record regarding other positions, or any accommodations that MDC could have implemented to allow her to return to her old job. She therefore has failed to carry her burden and Defendant's motion for summary judgment is granted with respect to her ADA claim.

### 4. Workers' Compensation Retaliation Claim

Finally, in Count I of the Amended Complaint, Ms. Carman-Nurse alleges that MDC fired her "because she suffered a work-related injury, sought and received benefits under the workers' compensation statutes, and despite the fact that Plaintiff was ready, willing, and able to return to work . . . . " Am. Compl. at 5 (citing Conn. Gen. Stat. § 31-290a).

MDC has challenged this claim on two grounds. First, they have moved to dismiss, alleging that this Court lacks subject matter jurisdiction of the claim in the first instance. *See* Def.'s Mem. In Supp. Of Mot., ECF No. 24. Second, MDC argues that, even if the Court allows the claim to proceed beyond the motion to dismiss stage, it fails for the same reasons that the FMLA retaliation claim did.

Arguably, Count I should not have been removed in the first place. *See* 28 U.S.C. § 1445(c) ("A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."); *Miley v. Hous. Auth. of City of, Bridgeport*, 926 F. Supp. 2d 420, 426 (D. Conn. 2013) (holding that Conn. Gen. Stat. § 31-290a retaliation claim arose under state workers' compensation law and therefore remanding to state court under 28 U.S.C. § 1445(c)).

In any event, the Court has dismissed all federal claims in this case. "And if the court determines after removal that, in fact, there were no viable federal-question claims to confer jurisdiction, then, it must remand the case, including the supplemental claims to the state court." 14C Fed. Prac. & Proc. Juris. § 3722 (4th ed.); *see also See Klein & Co. Futures, Inc. v. Board of Trade of City of New York*, 46 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

The Court therefore remands this case to the Superior Court of the State of Connecticut for the Judicial District of Hartford.

## IV.     CONCLUSION

For the reasons stated above, Defendant's motion to amend is **GRANTED**. The motion to strike is **DENIED**. The motion to dismiss is **DENIED** as moot. The motion for summary judgment is **GRANTED** as to Plaintiff's FMLA interference and retaliation claims as well as her ADA claims.

The remainder of the case, her claim for retaliation under Connecticut's Workers' Compensation statutes, shall be remanded immediately to the Superior Court of the State of Connecticut for the Judicial District of Hartford.

The Clerk of the Court is directed to remand this case to the Superior Court of the State of Connecticut for the Judicial District of Hartford and then close it here.

**SO ORDERED** at Bridgeport, Connecticut, this 15th day of August, 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE